UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| CECIL C. NEVELS, III, ) | |
| ) | |
| Plaintiff, ) | Civil No. 10-83-ART |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION &** |
| DEERBROOK INSURANCE CO., ) | **ORDER** |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

The plaintiff, Cecil Nevels, has presented sufficient evidence of Deerbrook Insurance Company's bad faith in its failure to settle his insurance claim. Therefore, summary judgment on that claim is not appropriate. But summary judgment is appropriate to the extent that Nevels seeks attorney fees and prejudgment interest because under Kentucky law he may not recover these amounts.

## BACKGROUND

In October 2005, Cecil Nevels and Patrick Scott were driving southbound on U.S. Highway 27 while Michael Melton was travelling northbound in a pickup truck hauling a utility trailer loaded with lumber. R. 16-1 at 3. According to Melton, a vehicle pulled out of a gas station in front of him, causing him to brake suddenly and lose control of the trailer. *Id.* The trailer shifted left and entered the southbound lane. *Id.* Lumber from the trailer struck Scott's left-front tire, causing his vehicle to cross into the northbound lane. *Id.* at 3–4. Scott then collided with a third vehicle driven by Robert Coffey. *Id.* at 4.

Shortly after the accident, both Nevels and Scott sought medical treatment and attorney representation. *Id*. at 5. The third driver, Coffey, settled his claims with Melton's insurance company, Deerbrook Insurance Company, within a month. *Id*. Deerbrook, Nevels, and Scott corresponded over the next several months. *Id*. at 5−6. In May 2006, Deerbrook received notice through Scott's insurance company of a Personal Injury Protection ("PIP") lien for Nevels's medical expenses. *Id*. at 6−7. In August 2006, Deerbrook received a demand package from Nevels's attorney that included a letter describing Nevels's treatment for severe headaches and upper back, neck, and right elbow pain. R. 18-1 at 29. It also included a copy of the police report, a copy of the PIP ledger indicating a $10,500 lien amount, and medical records. R. 16-1 at 7.

Almost immediately, Deerbrook began evaluating the information provided. *Id*. at 8. The evaluation included use of software known as Colossus, a tool that helps value unliquidated damages, such as pain and suffering, and provides an estimated settlement range. *Id*. An adjustor manually enters data compiled in a claim investigation, such as medical examinations and medical bills, and the software reports a recommended settlement range. *Id*. at 8–9. According to Deerbrook, in August 2006, the report for Nevels's claim recommended settlement between $4,900 and $6,200. *Id*. An evaluation consultant to whom the adjustor reported authorized settlement in the amount of $6,000. *Id*. The adjustor contacted Nevels's attorney and made an initial settlement offer of $5,000. *Id*. In response, Nevels's attorney sent a

demand letter for the policy limits of $25,000 and filed suit shortly thereafter. *Id*. at 9–10.

But wait, there's more. After suit was filed in November 2006, Deerbrook retained attorney Ed Henry. *Id*. at 10. Henry spoke with Melton about the accident and determined that it was worthwhile to investigate whether another vehicle, a so-called "phantom vehicle," pulled in front of Melton. *Id*. Deerbrook proceeded despite Coffey's statements that he did not see another vehicle cause the accident, R. 18-7 at 3, and the police report stating that no one else witnessed another vehicle cause the accident, R. 18-1 at 8. In January 2008, over a year later, Henry finally located and deposed Coffey. R. 16-1 at 14. Unfortunately for Henry, Coffey confirmed that he did not see a phantom vehicle and also added that he noticed Melton's trailer weaving before the accident. *Id*. This ended Henry's belief that a jury could find in Melton's favor and "influenced Deerbrook's view of the case." *Id*. at 21.

In May 2008, Deerbrook, Nevels, and Scott mediated the claims. *Id.* at 15. By that time, Nevels had submitted only two new pieces of damages information: (1) $770 in lost wages, submitted in May 2007, *id*. at 11, and (2) a $1,650 chiropractor bill, submitted on the day of mediation, *id*. at 15. At mediation, Deerbrook settled with Scott for $25,000, the policy limits, but did not settle with Nevels. *Id*. Soon after, Deerbrook produced another Colossus report and, in June 2008, settled with Nevels for $21,700, the remaining policy limits. *Id*. What brought on the sudden change? In the second Colossus report, the "new" inputs included the lost wages,

chiropractor bill, and the $10,500 PIP lien. *Id.* This generated a settlement range of $20,190 to $22,170. *Id.*

In October 2008, Nevels filed suit against Deerbrook for bad faith alleging that the delay constituted a violation of the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"). Deerbook now moves for summary judgment.

## DISCUSSION

### I. Summary Judgment

Summary judgment is only appropriate if "there is no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, the Court may only grant summary judgment if no "reasonable jury could return a verdict for the nonmoving party." *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Additionally, the Court "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In this case, the evidence could plausibly support a jury verdict for Nevels. Summary judgment is therefore precluded.

The Kentucky Unfair Claim Settlement Practices Act ("KUCSPA") imposes a "duty of good faith and fair dealing" on an insurer. *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006). KUCSPA is intended to "protect the public from unfair trade practices and fraud" and "should be liberally construed so as to effectuate its

purpose." *State Farm Mut. Auto Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988). Specifically, KUCSPA proscribes a list of fifteen particular acts and practices. *Knotts*, 197 S.W.3d at 515. Here, Nevels alleges that Deerbrook did not attempt "in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." R. 18 at 9 (citing Ky. Rev. Stat. 304.12–230).

To prove bad faith, Nevels must show that Deerbrook (1) had an obligation to pay, (2) lacked a reasonable basis to deny benefits, and (3) either knew there was no reasonable basis or acted in reckless disregard as to whether a reasonable basis existed. *See Davidson v. American Freightways, Inc.*, 25 S.W.3d 94, 100 (Ky. 2000). The third part creates a high standard of culpability. Nevels must show "evidence sufficient to warrant punitive damages." *See Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 448 (Ky. 1997) (citing *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)). Punitive damages are warranted where there is proof of bad faith "sufficient for the jury" to find that the insurer's conduct was "outrageous." *Id*. at 452 (citing *Wittmer*, 864 S.W.2d at 890–91).

Deerbrook does not dispute that it had an obligation to pay. R. 16-1 at 19. Rather, Deerbrook argues that no reasonable jury could find that parts two or three of the bad faith test are met. *Id*.

   *A. Reasonable Basis to Deny Benefits*

Deerbrook contends that in August 2006, it had a reasonable basis not to pay the policy limits. *Id*. Deerbrook asserts that it did not know whether the accident caused all of Nevels's claimed injuries, *id*. at 20, nor, Deerbrook claims, did it have

the necessary information to evaluate properly Nevels's claim. *Id*. at 3. Specifically, Deerbrook's adjustor noted that Nevels had a four-day gap between the accident and his first doctor's visit and another gap in treatment between November 2005 and March 2006. *Id*. at 8. Thus, the adjustor questioned whether Nevels's treatment was related to the accident. *Id*. Additionally, Deerbrook is emphatic that in August 2006, it did not have Nevels's claim for lost wages or his final medical bill. *Id*. at 20.

To some extent, these provide partial explanations for the initial offer. But whether Deerbrook was reasonable is still an open question. In August 2006, Deerbrook knew by way of the PIP lien that Nevels's medical bills amounted to $10,500 and that he claimed pain and suffering. *Id*.. Yet, Deerbrook's initial offer was only $5,000. Fast forward almost two years and Deerbrook's settlement offer went up by more than 4 times that amount. What was the difference? The only new damages information was a $770 claim for lost wages, *id*. at 11, and a final medical bill of approximately $1,650, *id*. at 15. Even Deerbrook acknowledged the oddity of justifying an over $15,000 increase with only $2,400 of new information. *Id*. at 21. It attempts to explain this by emphasizing that the deposition of Coffey in January 2008 influenced Deerbrook's view of the case. *Id*.

But, at this stage, this explanation is not adequate for at least two reasons. First, it does not account for the fact that one of the "new" inputs in Deerbrook's second evaluation was actually old information, i.e. the $10,500 PIP lien. Deerbrook's fourfold increase in its settlement offer would be odd if it was based entirely on lost wages and the chiropractor's bill, but it seems that the first Colossus

6

report either did not account for the PIP lien at all or substantially discounted it. We cannot be certain how much, if any, of the PIP lien amount Deerbrook used because there is no record of the first evaluation. A print out of the second Colossus report is available, R. 18-1 at 2–5, but Deerbrook did not print the first report and also deleted the information used to generate the initial range when it generated the second report. R. 22 at 8 n.4. One explanation for the substantial discount is that in August 2006, Deerbrook doubted whether the accident caused all of Nevels's medical expenses. R. 16-1 at 8–9. But this cannot explain the lapse entirely. In June 2008, Deerbrook continued to have doubts about causation, *id.* at 15, yet suddenly included the full amount of the PIP lien in its evaluation and offered no explanation. Making inferences in favor of Nevels, as the Court must, this gap raises questions about whether Deerbrook's initial offer was reasonable.

Second, the decision to pursue a no-liability defense has nothing to do with the reasonableness of the initial offer. Deerbrook stated that it was Henry's decision to pursue the defense. R. 22 at 4. But Deerbrook hired Henry *after* the initial offer. When the offer was made, Deerbrook's records reflected that Melton was liable for the accident, R. 18-1 at 6, that there was no proof of a "phantom driver," *id.*, and that Coffey already stated he did not see a phantom driver, R. 18-7 at 3. Deerbrook's claim that Coffey's deposition greatly influenced its opinion of the case may be true, but it does not explain why the offer was reasonable in August 2006.

All together, the evidence suggests that Deerbrook had substantially the same information in August 2006 as it did in June 2008. If so, it is difficult to understand

7

why the case's settlement value was over $20,000 at one time but not the other. Based on this, a jury could plausibly find that Deerbrook lacked a reasonable basis in its initial offer.

*B. Culpability*

Deerbrook insists that it did not have the culpability necessary to find bad faith. R. 16-1 at 22. Generally, demonstrating culpability is the most difficult part of the bad faith test. Nevels must not only show that Deerbrook was unreasonable, but that it either *knew* it was being unreasonable or that it acted recklessly. *See Davidson*, 25 S.W.3d at 100. The culpability requirement ensures that "mere negligence" alone does not trigger higher liability. *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000). Still, even if the value of Nevels's claim was debatable, this does not relieve Deerbrook of liability. Payment of a claim may be "fairly debatable," but an insurer is "still obligated under the Act to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner." *Id*. at 375. On the other hand, just because Deerbrook did not pay Nevels for almost two years is not enough to show culpability. A delay in payment on its own "does not amount to outrageous conduct absent some affirmative act of harassment or deception." *Glass*, 996 S.W.2d at 452. Rather, there must be proof "supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id*. at 452–53.

In all, the evidence presented provides a reasonable basis to establish that Deerbrook had questionable motives in its settlement offer and investigation methods.

First, Deerbrook made a $5,000 offer when it knew Nevels had over $10,000 in claimed medical expenses. R. 18 at 12. This could imply that Deerbrook knew it was being unreasonable. Deerbrook insists that it did not have Nevels's lost wages claim or final medical bill in August 2006, but this is hardly persuasive. Deerbrook had the bulk of Nevels damage information when it made its initial offer, including the PIP lien amount. The $2,400 in additional damages does not reasonably support an over $15,000 increase in settlement. Rather, a jury could infer that Deerbrook was either reckless not to consider the PIP lien amount or intentionally made a low initial offer. Additionally—and what is even more suggestive of a questionable motive—when Deerbrook acquired new information, it still waited several months to reconsider its settlement offer. Deerbrook received the lost wages amount in May 2007. R. 16-1 at 11. But it did nothing with this information. In January 2008, Deerbrook confirmed that there was no phantom driver, *id.* at 14, and still did nothing. And during mediation in May 2008, Deerbrook received the final piece of information, the chiropractor's bill, *id.* at 15, and still held out. Drawing inferences in favor of Nevels, these discrepancies provide enough evidence for a jury to determine that Deerbrook knew it was being unreasonable or was reckless.

Second, Deerbrook leans heavily on its pursuit of Melton's zero-liability defense as a reason for the delay, but this does not affect the analysis. Deerbrook is bound by its obligation to deal in good faith in both pre- and post-litigation activities. *See Knotts*, 197 S.W.3d at 517. Thus, Deerbrook does not have a reprieve from acting unreasonably just because it was engaged in litigation over the claim. But even

more importantly, at the time of the initial offer, all of the information possessed by Deerbrook indicated that Melton was completely at fault. Deerbrook stated that it undertook the litigation because Henry advised it to investigate Melton's liability, but an attorney's advice is not a defense to bad faith. *Hamilton Mut. Ins. Co. of Cincinnati v. Battery*, 220 S.W.3d 287, 294 (Ky. App. 2007) ("Kentucky courts have never held that advice of counsel provided an absolute defense against allegations of an insurer's bad faith."). "Reliance on the advice of counsel must still be reasonable." *Id*. At the end of the investigation, all Deerbrook achieved was confirmation of what it already knew. Deerbrook may have had genuine motives to investigate the claim, but when viewed in the light most favorable to Nevels, a jury could find bad faith.

C. *Scott v. Deerbrook*

Scott filed a separate bad faith claim against Deerbrook. *See Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670 (E.D. Ky. 2010). In that case, Judge Van Tatenhove, in a well-written opinion, granted Deerbrook's motion for summary judgment. *Id*. at 672. But *Scott* does not compel a different result here. First, the court in *Scott* thought it likely—but did not decide—that Deerbrook had a reasonable basis for initially offering $7,000. *Id*. at 679. An important difference was that Deerbrook seemed to acknowledge that it would also be liable for Scott's PIP lien in addition to the $7,000 offered. *Id*. at 678. That is not the case here. Deerbrook has in no way indicated that its initial settlement offer included the $10,500 PIP lien for Nevels. Second, the court affirmatively held that Scott could not show culpability, *id*. at 679, finding it significant that Scott's claim settled at mediation, *id*. at 680.

Similar to Nevels, Scott submitted new information to Deerbrook in May 2008, but in contrast, Deerbrook did not settle Nevels's case immediately. These important factual distinctions distinguish the two cases and their outcomes.

## II. Partial Summary Judgment

In the alternative, Deerbrook argues that it is entitled to partial summary judgment to the extent Nevels is seeking attorneys' fees and prejudgment interest. R. 16-1 at 24. Deerbrook is correct. In his complaint, Nevels alleges that he is entitled to recover prejudgment interest, attorney fees, and punitive damages. R. 1-1 at 4. Ky. Rev. Stat. 304.12-235 authorizes prejudgment interest and attorneys fees, but it does not apply to third-party claims. The plain text of the statute refers only to "named insured person[s] or health care provider[s]" and the Kentucky Supreme Court has confirmed that Ky. Rev. Stat. 304.12-235 "applies only to an insurer's negotiations with its own policyholder or the policyholder's health care provider." *Glass*, 996 S.W.2d at 455. Nevels does not cite any case law to the contrary. Thus, because Nevels is not the policyholder, he cannot claim the benefits of Ky. Rev. Stat. 304.12-235 even if Deerbrook acted in bad faith.

## CONCLUSION

Accordingly, it is **ORDERED** that Deerbrook's motion for summary judgment, R. 16, is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** with respect to Nevels's claims for attorneys' fees and prejudgment interest, and it is **DENIED** as to Nevels's bad faith claim.

This the 6th day of September, 2011.

Signed By:
*Amul R. Thapar*  AT
United States District Judge