UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| CECIL C. NEVELS, III, ) | |
| ) | |
| Plaintiff, ) | Civil No. 10-83-ART |
| ) | |
| v. ) | |
| ) | **MEMORANDUM OPINION &** |
| DEERBROOK INSURANCE CO., ) | **ORDER** |
| ) | |
| Defendant. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Cecil C. Nevels, III, retained David L. Huff as an expert in bad faith law and insurance claims handling. Based on Mr. Huff's testimony at the *Daubert* hearing, he may opine on what Deerbrook Insurance Company's initial settlement offer to Nevels should have been, but he cannot take the next step and state that Deerbrook acted in bad faith. This is because Mr. Huff does not sufficiently understand Kentucky bad faith law. Additionally, Mr. Huff cannot opine on what a Pulaski County jury would have awarded Nevels in his third-party insurance claim. Thus, Deerbrook's motion in limine to exclude Mr. Huff's testimony is granted in part and denied in part.

## BACKGROUND

In October 2005, Cecil Nevels and Patrick Scott were driving southbound on U.S. Highway 27 while Michael Melton was travelling northbound in a pickup truck hauling a utility trailer loaded with lumber. R. 16-1 at 3. According to Melton, a vehicle pulled out of a gas station in front of him, causing him to brake suddenly and lose control of the trailer. *Id*. The trailer shifted left and entered the southbound lane.

*Id.* Lumber from the trailer struck Scott's left-front tire, causing his vehicle to cross into the northbound lane. *Id.* at 3–4. Scott then collided with a third vehicle driven by Robert Coffey. *Id.* at 4.

Shortly after the accident, both Nevels and Scott sought medical treatment and attorney representation. *Id.* at 5. The third driver, Coffey, settled his claims with Melton's insurance company, Deerbrook Insurance Company, within a month. *Id.* Deerbrook, Nevels, and Scott corresponded over the next several months. *Id.* at 5–6. In May 2006, Deerbrook received notice through Scott's insurance company of a Personal Injury Protection ("PIP") lien for Nevels's medical expenses. *Id.* at 6–7. In August 2006, Deerbrook received a demand package from Nevels's attorney that included a letter describing Nevels's treatment for severe headaches and upper back, neck, and right elbow pain. R. 18-1 at 29–30. It also included a copy of the police report, a copy of the PIP ledger indicating a $10,500 lien amount, and medical records. R. 16-1 at 7.

Armed with this information, Deerbrook evaluated Nevels's claim using software known as Colossus. *Id.* at 8. According to Deerbrook, Colossus reported a settlement amount between $4,900 and $6,200. *Id.* An adjuster contacted Nevels's attorney and made an initial settlement offer of $5,000. *Id.* In response, Nevels's attorney sent a demand letter for the policy limits of $25,000. *Id.* at 9–10. Nevels filed suit shortly thereafter. *Id.*

Once Nevels filed suit, Deerbrook retained attorney Ed Henry. *Id.* at 10. Henry spoke with Melton about the accident and determined that it was worthwhile to

2

investigate whether another vehicle, a so-called "phantom vehicle," pulled in front of Melton. *Id*. Deerbrook began looking into the existence of a phantom vehicle despite Coffey's statements that he did not see another vehicle cause the accident, R. 18-7 at 3, and the police report's indication that no one else witnessed another vehicle cause the accident, R. 18-1 at 8. Henry finally deposed Coffey over a year later in January 2008. R. 16-1 at 4. But Coffey only confirmed that he did not see a phantom vehicle and also added that he noticed Melton's trailer weaving before the accident. *Id*. This ended Henry's belief that a jury could find in Melton's favor and "influenced Deerbrook's view of the case." *Id*. at 21.

In May 2008, Deerbrook, Nevels, and Scott mediated the claims. *Id*. at 15. By that time, Nevels had submitted only two new pieces of information about his damages: first, $770 in lost wages, submitted in May 2007, *id*. at 11, and second, a $1,650 chiropractor bill, submitted on the day of mediation, *id*. at 15. At mediation, Deerbrook settled with Scott for $25,000, the policy limits, but did not settle with Nevels. *Id*. Soon after, Deerbrook produced another Colossus report that generated a settlement range of $20,190 to $22,170. *Id*. Finally, in June 2008, Deerbrook settled with Nevels for $21,700, the amount remaining under the policy limits. *Id*.

In October 2008, Nevels filed suit against Deerbrook for bad faith alleging that the delay constituted a violation of the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA"). Compl., R. 1-1 ¶ 8. In support of his case, Nevels hired David L. Huff as his expert on claims handling procedures and bad faith under Kentucky law. R. 17-1 at 1. Based on Huff's deposition, Deerbrook filed a motion in limine to

exclude Huff's testimony. R. 17. The Court held a *Daubert* hearing to gauge the reliability of Mr. Huff's testimony. R. 27. On completion of the hearing, the Court dismissed Deerbrook's motion in limine without prejudice and asked Deerbrook to file a renewed motion in limine in order to address three specific issues. R. 33. Those specific issues were: (1) whether Huff applied the proper legal standard when he opined that Deerbrook acted in bad faith, (2) whether Huff's testimony regarding Deerbrook's claims handling is unreliable because he did not review materials related to Melton's liability, and (3) whether Huff's opinion about the value of Nevels's personal injury claim is admissible. R. 34 at 81-83. Deerbrook's renewed motion in limine raised no other issues. R. 35-1.

## DISCUSSION

Rule 702 of the Federal Rules of Evidence provides a two-part test for admitting expert testimony. The Court must determine first whether the expert is qualified and his testimony is reliable, and second whether the testimony is relevant and helpful to the trier of fact. *See United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir. 1997). The party offering expert testimony has the burden to show by a preponderance of the evidence that the expert's testimony is admissible. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993). The Supreme Court has offered a number of factors that courts may consider to determine whether expert testimony is admissible: whether the expert's theory or technique is testable; whether it has been subjected to peer review or publication; its error rate; and the its general acceptance within the expert's community. *See id.* at 593-94. But this fact-intensive

4

inquiry is generally subject to the discretion of the trial court.  *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (holding that the *Daubert* factors are "not dispositive in every case"); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (holding that "the gatekeeping inquiry must be tied to the facts of a particular case, . . . depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony").

Based on his testimony at the *Daubert* hearing, Huff has extensive experience and knowledge to opine on what Deerbrook's initial settlement offer should have been.  But Huff cannot offer an opinion on whether Deerbrook acted in bad faith because he has neither any expertise in nor a complete understanding of Kentucky bad faith law.  Additionally, Huff cannot opine on what a jury in Pulaski County would have awarded Nevels because he has no basis for his opinion.

## I. Huff Can Testify About the Propriety of the Initial Settlement Offer

At the *Daubert* hearing, Huff demonstrated that he is qualified to testify that Deerbrook had the necessary information to settle with Nevels for the policy limits from the start.  *See* Huff Report, R. 18-6 at 2-3.  Huff has extensive experience as a claims adjuster, insurance defense attorney, and in-house counsel for an insurance company. R. 36 at 3.  Furthermore, his opinion is based largely on the observation that Deerbrook had substantially the same information at the time it made its initial $5,000 offer as it did when it settled with Nevels for $21,700 eighteen months later.  R. 18-6 at 3.

But wait, says Deerbrook. Huff failed to review depositions or other evidence related to Deerbrook's investigation of Melton's liability in the accident. *See* R. 34 at 39-40. Deerbrook claims that as a result, Huff's opinion is unreliable because it is not based on sufficient information. *Id.* at 11. Deerbrook's investigation, however, had nothing to do with their initial offer. Rather, Huff believes that Deerbrook pegged Melton for 100% liability at the outset and had all of the information necessary to settle for the policy limit. R. 18-6 at 3. There is no question that Huff's many years processing and supervising insurance claims make him qualified to render this specific opinion. Further, there is plenty of evidence in the record to support this theory. Deerbrook's own claim file noted that Melton was 100% liable for the accident. R. 36-5 at 184, 186-87. Moreover, at the time Deerbrook made the initial offer, it was not truly concerned with the phantom driver. Although Melton claimed a phantom driver caused the accident, the police report included in the claim file shows that no witnesses could confirm that a phantom driver was involved. R. 18-1 at 8. And Deerbrook interviewed Coffey soon after the accident who also stated that he did not see a phantom driver. R. 18-7 at 3. Melton's liability only came up after Deerbrook's attorney, Ed Henry, insisted on further investigations. R. 35-1 at 14. But this was *after* Deerbrook made its initial settlement offer. *Id.* And, after a year of investigating, Henry only confirmed what Deerbrook initially logged in the claim file—that no jury would find in Melton's favor. R. 16-1 at 21.

Because the investigation was immaterial to his opinion, Huff was not required to review information about it in order to testify. *See Beck v. Haik*, 377 F.3d 624, 636

(6th Cir. 2004) (agreeing with the district court that certain issues not relevant to the case were properly excluded from considering whether expert testimony was admissible), *overruled on other grounds*, *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009).

## II. Huff Cannot State Whether Deerbrook Acted in Bad Faith and Cannot State What a Pulaski County Jury Would Have Awarded Nevels

Although Huff can state that Deerbrook should have offered the policy limits at the outset, he cannot testify that Deerbrook's failure to do so means that it acted in bad faith. Additionally, Huff cannot state that Deerbrook should have offered the policy limits because a Pulaski County jury would have awarded Nevels an equivalent amount.

### A. Huff Has No Basis to State What a Pulaski County Jury Would Have Awarded Nevels

Deerbrook argues that Huff cannot opine on what Deerbrook should have offered Nevels at the outset because he has no basis to testify as to what a Pulaski County jury would have awarded Nevels. Deerbrook is correct that Huff cannot testify about what a Pulaski County jury would award, but it is not true that Huff is limited to this method of proving settlement value. According to Deerbrook, *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493 (Ky. 1976), limits proof of settlement value to what "a jury in the same community probably would have awarded at the time of the trial on liability." *Id*. at 501. This is not true. As Judge Van Tatenhove explained in *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670 (E.D. Ky. 2010), *Grundy* involved a first-party bad faith claim, which differs from this

7

third-party bad faith claim. *Id*. at 673 n.1. The focus in a third-party claim is whether the claimant received a just settlement in a timely fashion, not whether the claimant is exposed to a verdict in excess of his policy limits. Therefore, what a jury would award a claimant is simply one way to value the plaintiff's claim, but it "is not the only evidence a jury can and should consider." *Id*. Huff is perfectly capable of testifying that Deerbrook should have offered the policy limits at the outset because it had all the necessary information.

But Huff cannot substantiate his opinion by testifying as to what a Pulaski County jury would have awarded Nevels. Huff has experience in claims adjusting, insurance defense, and as an in-house counsel for an insurance company, but at the *Daubert* hearing, Huff could not identify any case during his career in Pulaski County or the surrounding area. R. 34 at 22-24, 49-50. He also could not recall any Pulaski County verdicts reported in the Kentucky Trial Reporter despite claiming he relied extensively on this resource. *Id*. at 48-49. Given this lack of support, it is unclear what Huff relied on when he stated that Pulaski County is "middle of the road" in terms of jury verdicts, *id*. at 49-50, and that a Pulaski County jury would have awarded Nevels at least $25,000, *id*. at 18. *Daubert* and its progeny make it clear that "[p]roposed [expert] testimony must be supported by appropriate validation." 509 U.S. at 591. Here Huff offers no method of validation and thus no way for his opinion to be verified, replicated, or discredited. In short, Deerbrook has no meaningful way to engage in cross-examination. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). As Deerbrook readily admits, an expert does not need to be a Pulaski County trial lawyer. R. 35 at 1. But an expert must be able to verify his conclusions in specific examples or research. Huff has offered no such support. Thus, he may not testify about what a Pulaski County jury would have awarded Nevels.

### B. Bad Faith Requires Outrageous Conduct

Huff cannot opine on whether Deerbrook acted in bad faith because his testimony demonstrates that he does not understand Kentucky bad faith law. Huff insisted in his deposition and at the *Daubert* hearing that an insurer's conduct does not need to be considered "outrageous" to constitute bad faith. R. 35-4 at 56-57; R. 34 at 14. Instead, Huff believes that there are "two standards": conduct "can either be [1] outrageous or [2] it can be a reckless indifference to the rights of the claimant." R. 34 at 14. He is incorrect. In Kentucky, an insurer's conduct must be outrageous to constitute bad faith. The Kentucky Supreme Court has stated that in order to sustain a bad faith cause of action, "there must be evidence sufficient to warrant punitive damages." *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993). And punitive damages are warranted where there is proof of bad faith "sufficient for the jury to conclude that there was 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Id*. (quoting *Fed. Kemper v. Hornback*, 711 S.W.2d 844, 848 (Ky. 1986)). Nevels, like Huff, insists

that reckless indifference is a standard of proof, R. 36 at 5, but *Wittmer* makes it clear that reckless indifference is merely *evidence* of outrageous conduct. In fact, courts since *Wittmer* have consistently required outrageous conduct in order to demonstrate bad faith. *See, e.g.*, *Hamilton Mut. Ins. Co. of Cincinnati v. Buttery*, 220 S.W3d 287, 293 (Ky. App. 2007) ("A cause of action for a violation of the UCSPA may be maintained only where there is proof of bad faith of an outrageous nature."); *United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. App. 2003) ("Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured."). Only one court—in an unpublished opinion—explicitly held that "outrageous conduct is not required to prove bad faith." *Hamilton Mut. Ins. Co. of Cincinnati, Ohio v. Barnett*, 2008 WL 3162321 (Ky. App. Aug. 8, 2008). But under Kentucky State Rules of Civil Procedure 76.28(4)(c), *Barnett* is not binding precedent because it is unpublished. Rather, the several published opinions that address the issue are controlling law. *See, e.g.*, *Buttery*, 220 S.W.3d at 293; *Bult*, 183 S.W.3d at 186.

Because Huff presumed that bad faith could be proven without demonstrating outrageousness of some form, he is not qualified to express an opinion as to whether Deerbrook acted in bad faith. Indeed, Huff is not prepared to say that Deerbrook's conduct was outrageous. Huff's Dep., R. 35-4 at 4-5 (Dep. pp. 56-57) ("That's not the word [outrageous] I'm comfortable using at this time."); Huff's Daubert Test., R. 34 at 14 ("And I didn't think the conduct was outrageous, and I said so. I wasn't comfortable with that word.").

Nevels asserts that even if Huff misunderstands bad faith law, Huff's testimony should still be admitted because it only affects his credibility and not his qualifications. R. 36 at 6 (citing *Morales v. Am. Honda Motor Co.*, 151 F.3d 505, 516 (6th Cir. 1998)). But this is plainly incorrect. Misstatements of the law are "no more admissible through 'experts' than are falsifiable scientific theories." *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996). Further, Huff's opinion about bad faith goes to the ultimate issue in this case. By attempting to testify about whether Deerbrook acted in bad faith, Huff's mistaken legal opinions would be not only unreliable, but prejudicial.

## CONCLUSION

Accordingly, it is **ORDERED** that Deerbrook's motion in limine, R. 35, is **GRANTED IN PART** and **DENIED IN PART**.

This the 16th day of December, 2011.

Signed By:
*Amul R. Thapar* AT
United States District Judge